2003 SD 17

**PUBLIC ENTITY POOL FOR LI-
ABILITY, (PEPL), Plaintiff
and Appellee,**

v.

**David SCORE, Individually and as Per-
sonal Representative of the Estate
of Gina Score, Defendant,**

and

**Tamara Wagaman, Individually, and in
her Capacity as an Employee of the
State of South Dakota, Defendant and
Appellant.**

Nos. 22250, 22251, 22301.

Supreme Court of South Dakota.

Argued Nov. 20, 2002.

Decided Feb. 12, 2003.

Rehearing Denied March 27, 2003.

Brent A. Wilbur, Bobbi J. Benson, Pierre, South Dakota, Attorneys for plaintiff and appellee.

James G. Abourezk, Rita Allen, Sioux Falls, South Dakota, Attorneys for defendant and appellant Tamara Wagaman.

KONENKAMP, Justice.

[¶ 1.] Along with several other state employees, two juvenile facility supervisors were sued in federal court for their involvement in the death of a juvenile inmate at the State Training School. South Dakota maintains the Public Entity Pool for Liability (PEPL fund) for the defense of tort claims against state employees. While agreeing to defend the other state employees, the PEPL fund declined to defend the two supervisors and brought a declaratory judgment action, seeking a ruling that their conduct was not covered. Following a trial, the circuit court ruled that the PEPL fund was responsible for defending the two supervisors in the federal case and ordered the payment of their attorney's fees incurred in that suit. One supervisor also sought to recover her attorney's fees in the declaratory judgment action. In granting summary judgment for the PEPL fund, the circuit court ruled that the supervisor was not entitled to her attorney's fees in the declaratory case because the PEPL fund's actions in denying coverage and in seeking declaratory relief were not vexatious or unreasonable. We conclude that there is no legal authority for obtaining an award of attorney's fees against the PEPL fund in a declaratory action. We also uphold the circuit court's rulings in two discovery-related disputes.

## Background

[¶ 2.] On July 21, 1999, Gina Score, a juvenile resident at the State Training School, collapsed during a 2.4 mile forced run-walk supervised by Tamara Wagaman and Raelene Layne. Score later died in the hospital. Criminal charges were brought against Wagaman and Layne. Both were later acquitted. In a civil complaint dated October 28, 1999, Score's family brought suit in federal district court against several state employees and others, including Wagaman and Layne. The PEPL fund defends and indemnifies state employees sued for negligence in the course of their employment. *See* SDCL Chapter 3–22. While agreeing to defend the other state employees under a reservation of rights, the PEPL fund declined to defend Wagaman and Layne. Wagaman hired attorney James G. Abourezk to represent her.

[¶ 3.] On November 22, 1999, the PEPL fund initiated a declaratory judgment action in circuit court, seeking a declaration that it had (1) no obligation to defend Wagaman and Layne in the federal lawsuit, and (2) no obligation to pay any damages award against them. Wagaman counterclaimed, alleging bad faith and breach of contract in failing to pay her legal expenses in the federal lawsuit and in bringing the declaratory judgment action.

[¶ 4.] Attorney Abourezk deposed a number of people, including Governor William Janklow. During that deposition, the Governor refused to answer certain questions, asserting attorney-client privilege. Abourezk then sought a court order to compel answers to these questions. In addition, he attempted to subpoena the Governor to appear at the hearing. The circuit court quashed the subpoena. At the hearing, Abourezk indicated that he wanted to discover the content of the discussions the Governor had with the administrator of the PEPL fund and its attorney concerning the federal lawsuit. Although the court ruled that Janklow prematurely asserted the attorney-client privilege because the questions he refused to answer were preliminary, the court ruled that the content of these conversations were privileged. Abourezk never attempted a follow-up deposition of the Governor. The court refused to grant financial terms

against the PEPL fund for the Governor's refusal to answer the questions.

[¶ 5.] Ultimately, the circuit court ruled that the PEPL fund was responsible for (1) defending Wagaman and Layne in the federal lawsuit and (2) paying all reasonable legal fees the two had previously incurred in that suit.[1] Shortly thereafter, a dispute arose concerning what were reasonable fees for Wagaman's defense. Because the attorneys defending the other employees on behalf of the PEPL fund were charging $110 per hour, the fund did not want to pay Abourezk a higher hourly rate. However, Abourezk's agreement with Wagaman was for $125 per hour. To support his claim for his fees, Abourezk subpoenaed the billing records and the partnership agreement of the Johnson, Heidepriem, Miner, Marlow and Janklow law firm, the firm hired to represent the other state employees. The subpoena commanded the partners to produce all their billing records in the federal lawsuit and to produce the documents showing how all money received by the firm is split between the partners. The court granted the Johnson law firm's motion to quash and awarded financial terms against Abourezk for abuse of the subpoena process.

[¶ 6.] In February 2001, the federal lawsuit was settled, leaving only the question whether the PEPL fund would be responsible for Wagaman's legal fees in the declaratory action. Both sides moved for summary judgment. The circuit court granted summary judgment for the PEPL fund. Wagaman appeals on the following issues: (1) Whether the court erred in granting summary judgment against Wagaman and in favor of the PEPL fund on Wagaman's counterclaim and motion for defense expenses for the declaratory judgment action.[2] (2) Whether the court abused its discretion in granting terms against Wagaman's counsel and in favor of the law firm from which Wagaman's counsel had subpoenaed partnership and fee splitting agreements. (3) Whether the court abused its discretion in denying Wagaman's motion for terms against the PEPL fund, when Wagaman attempted to compel the testimony of Governor Janklow.

### 1. Attorney's Fees for Defending Declaratory Action

[¶ 7.] Wagaman seeks to recover from the PEPL fund her attorney's fees incurred in this declaratory action.[3] Under the American Rule, the rule prevailing

---

1. Although the dissent contends that with this decision the judicial system cannot enforce the provisions of SDCL 3–22–8, and that state employees cannot get redress when they are denied coverage, this is precisely what the circuit court ordered. It found that Wagaman was covered by the PEPL fund and required the fund to pay all her reasonable attorney's fees and expenses in the federal suit against her. The State has not appealed that decision. Despite the dissent's criticism of Wagaman's superiors, we are bound to base our decision on the record and the issues presented.

2. Our standard of review for summary judgments has been recited in numerous cases and need not be repeated here. *See Kobbe-*

*man v. Oleson*, 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635.

3. Any discussion of claims against the State or its subsidiaries must include a consideration of sovereign immunity. Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment. *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999) (citations omitted). In the absence of constitutional or statutory authority, an action cannot be maintained against the State. *See generally Lick v. Dahl*, 285 N.W.2d 594 (S.D.1979); *Darnall v. State*, 79 S.D. 59, 108 N.W.2d 201 (1961); *Griffis v. State*, 68 S.D. 360, 2 N.W.2d 666 (1942); *Mullen v. Dwight*, 42 S.D. 171, 173 N.W. 645

in South Dakota, parties to litigation are required to pay their own attorney's fees, absent an agreement, statute, or rule to the contrary.[4] SDCL 15–17–38; *Boland v. City of Rapid City*, 315 N.W.2d 496, 503 n. 4 (S.D.1982). In cases where insureds have sought to recover attorney's fees against commercial insurers in declaratory judgment actions, those courts applying the traditional American Rule have refused to allow recovery.[5] In other jurisdictions, the traditional rule has been modified or abrogated, by statute or court rule. *See* Annotation, Jane Massey Draper, *Insured's Right To Recover Attorney's Fees Incurred in Declaratory Judgment Action To Determine the Existence of Coverage Under Liability Policy*, 87 ALR3d 429 (1978).

[¶ 8.] No provision in the South Dakota's Declaratory Judgment Act allows for an award of attorney's fees to the prevailing party.[6] *See* SDCL ch 21–24. Wagaman asserts that § 58–12–3, a provision in our insurance code, authorizes attorney's fees when an insurer's refusal to defend its insured is vexatious and unreasonable. She also contends that the PEPL fund contract provides for attorney's fees in declaratory actions.[7] For the reasons explained below, we conclude that she is not entitled to recover her attorney's fees in a declaratory action against the PEPL fund.

---

(1919). Our Legislature has defined the conditions for the waiver of sovereign immunity in SDCL 21–32A–2. Under this statute, the State's liability is limited to the contractual terms governing the PEPL fund.

4. The United States Supreme Court first announced this rule in *Arcambel v. Wiseman*, 3 U.S.(3 Dall.) 306, 1 L.Ed. 613 (1796); *see Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717–18, 87 S.Ct. 1404, 1406–07, 18 L.Ed.2d 475 (1967). The American Rule is discussed at length in *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

5. *See, e.g., Shepard Marine Constr. Co. v. Maryland Cas. Co.*, 73 Mich.App. 62, 250 N.W.2d 541, 543 (1976); *New Hampshire Ins. Co. v. Christy*, 200 N.W.2d 834, 845 (Iowa 1972) (although the insurer was liable for insured's attorney fees incurred in defending the third party's suit against the insured, the insurer was not liable, in the absence of fraud, bad faith or stubborn litigiousness, for the insured's expense for defending the declaratory judgment proceeding brought by the insurer); *Lujan v. Gonzales*, 84 N.M. 229, 501 P.2d 673, 682 (Ct.App.1972); *State Farm Mut. Auto. Ins. Co. v. Vails*, 278 Ala. 266, 177 So.2d 821, 826 (1965); *Carter v. Virginia Sur. Co.*, 187 Tenn. 595, 216 S.W.2d 324, 328 (1948); *Maryland Cas. Co. v. Sammons*, 63 Ga.App. 323, 11 S.E.2d 89, 91–92 (1940); *Bonnie Owen Realty, Inc. v. Cincinnati Ins. Co.*, 283 Ill.App.3d 812, 219 Ill.Dec. 294, 300, 670 N.E.2d 1182, 1188 (1996); *Mikel v. American Ambassador Cas. Co.*, 644 N.E.2d 168, 173 (Ind.App.1994); *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173 (1976) (insurer has an absolute right to dispute and litigate claims in good faith); *Clemmons v. Zurich Gen. Accident & Liab. Ins. Co.*, 230 So.2d 887, 895 (La.App.1969); and *American Family Mut. Ins. Co. v. Brown*, 631 S.W.2d 375, 379 (Mo. App.1982).

6. SDCL 21–24–11 provides: "In any proceeding under this chapter the court may make such award of costs as may seem equitable and just." Several courts have held that this provision in the Uniform Declaratory Judgment Act does not entitle the prevailing party to 'attorney's fees. *Chapin v. Collard*, 29 Wash.2d 788, 795, 189 P.2d 642, 646 (1948) (the term "costs" is synonymous with the term "expense" and does not include counsel fees; counsel fees are not costs or recoverable expenses); *Rocky Mountain Fire & Cas. Co. v. Rose*, 62 Wash.2d 896, 385 P.2d 45 (1963); *Shepard Marine Constr. Co. v. Maryland Cas. Co.*, 73 Mich.App. 62, 250 N.W.2d 541 (1976); *Spiva v. Phoenix Indem. Co.*, 167 Cal.App.2d 496, 334 P.2d 614 (1959).

7. In the circuit court, Wagaman also contended that because the PEPL fund committed the tort of bad faith in refusing to defend her, she was entitled to attorney's fees as damages. She does not raise this contention on appeal. Thus, we consider that issue abandoned.

[¶ 9.] The statute Wagaman cites as authority for recovering her attorney's fees provides as follows:

In all actions or proceedings hereafter commenced against *any employer who is self-insured,* or insurance company, including any reciprocal or interinsurance exchange, on any policy or certificate of any type or kind of insurance, if it appears from the evidence that such company or exchange has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, ... the trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs[.]

SDCL 58–12–3 (emphasis added). Wagaman contends that because South Dakota is a self-insured employer and because the PEPL fund vexatiously and unreasonably refused to defend her in the federal suit, she is entitled to her attorney's fees. On several occasions, this Court has characterized the PEPL fund as a liability self-insurance pool. *PEPL v. Winger,* 1997 SD 77, ¶ 8, 566 N.W.2d 125, 128 n. 5; *Kyllo v. Panzer,* 535 N.W.2d 896, 900 (S.D.1995); *see generally* In re Request for Opinion of Supreme Court, 379 N.W.2d 822 (S.D. 1985). Also, because the concepts are similar to insurance, we have adopted insurance law principles in cases of employee coverage questions. *See PEPL v. Winger, supra.* In *Winger,* we used those principles in interpreting the statutory provisions governing the PEPL fund to decide what acts fell within an employee's scope of employment. SDCL 3–22–2(13).

[¶ 10.] Yet, we have never held the PEPL fund accountable under our insurance code. To do so would be to ignore the plain text of § 3–22–18: "The PEPL does not constitute insurance nor may it be considered an insurance company under the laws of South Dakota nor is the PEPL under the jurisdiction of the commissioner of insurance." Thus, whatever name one might ascribe to it, the PEPL fund is not insurance—not "self-insurance," "reciprocal insurance," or "interinsurance." In creating the PEPL fund and enacting § 3–22–18, the Legislature obviously intended to distinguish between this public liability pool and traditional insurance by excluding the PEPL fund from laws regulating traditional insurance companies. *Cf., e.g., City of Arvada v. Colorado Intergovernmental Risk Sharing Agency,* 19 P.3d 10, 13 (Colo 2001).

[¶ 11.] The rationale for exempting the PEPL fund from the strictures of the insurance code is apparent. As one California appellate court explained in dealing with a similar fund:

[To subject a self-insurance pool] to the statutory requirements of the Insurance Code would place member entities in the position of having the same duties and obligations as commercial insurers.... Such an arrangement would adversely affect the pool's ability to provide members cost-effective liability coverage and subsequently defeat the purpose and intent of these self-insuring groups.

*City of South El Monte v. Southern Cal. Joint Powers Ins. Auth.,* 38 Cal.App.4th 1629, 45 Cal.Rptr.2d 729, 731 (1995).[8]

8. Several other courts have also held that so-called public self-insurance pools are not governed by state codes controlling commercial insurers. *See, e.g., Doucette v. Pomes,* 247 Conn. 442, 724 A.2d 481 (1999); *Young v. Progressive S.E. Ins. Co.,* 753 So.2d 80, 85–86 (Fla.2000) (holding that a self-insurance pool "does not constitute insurance in any real sense" because it retains the risk of loss); *Stratton v. Med. Ctr. Rehab. Hosp.,* 547 N.W.2d 748, 750 (N.D.1996); *Va. Mun. Liab.*

[¶ 12.] SDCL 58–12–3 is an insurance code provision applicable to insurers, self-insurers, and insurance companies. We rigorously defined the scope of an earlier version of § 58–12–3 in the case of *Ofstad v. DOT*, 387 N.W.2d 539 (S.D.1986). There, we held that because the employer was not an insurer as that term was defined in our statutes, the employer could not be held liable for attorney's fees as an insurer under § 58–12–3. Here, the circuit court apparently assumed for the sake of argument that § 58–12–3 applied and then ruled that the PEPL fund's actions in refusing to defend Wagaman and in seeking declaratory relief were not vexatious or unreasonable. We need not go that far. Because § 58–12–3 is inapplicable against the PEPL fund, there is no need to decide whether the fund's actions were vexatious.

■ [¶ 13.] Wagaman next contends that her attorney's fees in this declaratory action may be awarded under the terms of the PEPL fund's Memorandum of Liability Coverage. Usually, the ultimate determiner in issues over coverage is the liability contract itself. Questions of coverage are properly answered by adverting to the rules of contract law that rely on the intent of the parties. The rules governing the PEPL fund are contained in SDCL ch 3–22 and in the contractual provisions of the "Participation Agreement Between the Public Entity Pool for Liability and the State of South Dakota," with its attached "Memorandum of Liability Coverage." The Memorandum provides for both "damage coverage" and "defense coverage." The section providing for defense coverage

states that "defense costs" are payable in addition to the coverage limit. The Memorandum then defines "defense costs" as "fees and expenses generated by and related to the adjustment, investigation, defense or litigation of *a claim*, including attorney's fees." (Emphasis added.) Wagaman then argues that attorney's fees in this declaratory judgment action are "clearly related to the defense and litigation of the claim, and clearly constitute defense costs to which she is entitled by contract."

[¶ 14.] The contract memorialized in the Participation Agreement and attached Memorandum is between the PEPL fund and State of South Dakota. Wagaman paid no premiums in return for coverage and had no direct contractual relationship with the PEPL fund. The circuit court ruled that as a state employee covered under the PEPL fund agreement, she was entitled to "damage coverage" and "defense coverage" in the federal suit. However, the Memorandum did not authorize payment of attorney's fees in a declaratory judgment action. The specific language of the Memorandum refers to "defense coverage" and states that the PEPL fund will "defend any claim or suit for damages not excluded hereunder." Within the same section, the Memorandum states that "defense costs are payable in addition to the coverage limit." But, as detailed above, defense costs must be "generated by and related to ... *a claim*." (Emphasis added.) A claim is "any claim or suit for damages," not a suit for declaratory judgment.[9]

---

*Pool v. Kennon*, 247 Va. 254, 441 S.E.2d 8, 10 (1994).

9. Some courts have adopted an exception to the American Rule, applicable to insurance companies. *See. e.g. Potomac Residence Club v. Western World Ins. Co.*, 711 A.2d 1228, 1233 (D.C.App.1997) ("We do not believe that

the American Rule was intended to deny counsel fees to an insured where, as here, that insured bought its policy and paid its premiums in order to secure its freedom from having to defend lawsuits and to pay counsel fees.") In our case, even if the PEPL fund could be treated as commercial insurance company, no one suggests that Wagaman pur-

[¶ 15.] We affirm the circuit court's grant of summary judgment, although not for the same reasons the court gave.

### 2. Award of Terms for Subpoena Abuse

[¶ 16.] Attorney Abourezk issued subpoenas, along with notices of taking depositions, to three lawyers in the Johnson firm: Steven Johnson, Matthew Tobin, and Russ Janklow. Johnson and Tobin had participated in defending the state employees in the federal lawsuit. Russ Janklow had not been involved in that case. The subpoenas commanded the attorneys to produce all "billing records and/or statements" submitted to the PEPL fund for work done on the federal case, together with "all records" showing how much was "received as payment" from the PEPL fund, and the hourly rate charged. The subpoenas also commanded the production of the "firm's partnership agreement and other documents which show how all monies received are split by the partners."

[¶ 17.] The Johnson firm agreed to turn over its billing records, but moved to quash the subpoenas to the extent that they commanded the firm to produce other materials showing the internal distribution of funds. At the hearing, attorney Abourezk denied seeking this information for "political or publicity purposes," as alleged by attorney Johnson. When asked by the court to explain how these partnership and fee sharing arrangements might lead to relevant evidence on the reasonableness of Abourezk's fees, Abourezk responded, "It's relevant in that there's a potential conflict of interest because the Governor's son [Russ Janklow], I believe, is receiving money from this contract with the state." Russ Janklow denied the allegation, saying "I never worked on this case whatsoever and never billed one hour and never repre-

sented the State of South Dakota in any respect."

[¶ 18.] The circuit court concluded that Abourezk "provided no evidence in support [of his] speculation and no explanation as to how that would have any bearing on the reasonableness of the fee that Abourezk was charging Wagaman." The court ruled that Abourezk issued the subpoena for the fee sharing arrangements and partnership agreement in "bad faith." It granted the Johnson firm's motion to quash. The firm requested financial terms, and, after issuing a memorandum opinion explaining its reasoning, the court awarded terms of $350 against Abourezk.

[¶ 19.] On appeal, attorney Abourezk does not argue that the court lacked legal authority to impose terms, but he contends that the court abused its discretion in quashing the subpoenas and in imposing terms. Abourezk believes that he should not have been penalized "for zealously representing his client in discovery when statutes concerning discovery are to be liberally construed." Our inquiry is two-fold: first, did the court have authority to award terms? And second, were the terms awarded by the court reasonable? Once it is determined that a court has authority to impose sanctions, abuse of discretion is the appropriate standard of review for an order imposing sanctions. *Aberle v. Ringhausen*, 494 N.W.2d 179, 182 (S.D.1992) (citing *Chittenden & Eastman Co. v. Smith*, 286 N.W.2d 314, 316 (S.D.1979)).

[¶ 20.] SDCL 15–6–26(b)(1) establishes the general scope and limits of discovery. The rule states:

Parties may obtain discovery regarding any matter, not privileged, which is rele-

---

chased PEPL coverage or paid any premiums. The coverage is provided to South Dakota

employees automatically without payment of premiums.

vant to the subject matter involved in the pending action.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

When discovery efforts go· beyond those subjects not "reasonably calculated to lead to the discovery of admissible evidence," a court has authority to issue protective orders, quash subpoenas, and grant terms when appropriate. SDCL 15–6–26(c), 37(a)(4), 45(b) and 45(d)(1).

[¶ 21.] SDCL 15–6–45(d)(1) permits the issuance of a subpoena duces tecum commanding "the person to whom it is directed to produce and permit inspection and copying of designated books, papers, documents, or tangible things which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by § 15–6–26(b)[.]" A subpoena duces tecum is subject to the provisions of §§ 15–6–26(c) and 15–6–45(b). SDCL 15–6–26(c) allows for protective orders, authorizing a court to make "any order" that justice requires to protect a person from, among other things, "annoyance, embarrassment, oppression, or undue burden or expense[.]" That statute also states that the provisions of § 15–6–37(a)(4) apply, allowing for the award of reasonable expenses, including attorney's fees.

[¶ 22.] Having determined that the circuit court had authority to impose terms in these circumstances, we next examine whether the court abused its discretion in so ordering. We note, first, that the award of terms under § 15–6–37(a)(4) is mandatory, rather than discretionary, unless the non-prevailing person's position was "substantially justified" or "other circumstances make an award of expenses unjust." In *State v. Guthrie*, we applied a

set of considerations for assessing reasonableness in an award of terms. 2001 SD 89, ¶ 12, 631 N.W.2d 190, 195.

The factors to consider when determining reasonableness include: (1) reasonable hours expended multiplied by a reasonable fee, (2) the severity of the sanction weighted against the equities of the parties, including ability to pay, (3) availability of less drastic sanctions which would prevent future abuses, and (4) other factors including the offending party's history and degree of bad faith contributing to the violation.

[¶ 23.] Under these factors, we conclude that the court awarded reasonable terms. As to the question whether the subpoenas for the Johnson firm's internal records were substantially justified, the court found that the "conduct of counsel in this case demonstrates a level of bad faith." That the subpoena was issued in bad faith necessarily subsumes the notion that it was not substantially justified. Attorney Abourezk could give no explanation on how this information would lead to relevant material on the question of the reasonableness of his charges to Wagaman. To the extent that "other circumstances" might make an award of expenses "unjust," the circuit court obviously considered those circumstances when it reduced the Johnson firm's claim. Although the court found the firm's statement of 6.15 hours and a fee of $100 per hour to be reasonable, it further reduced the award to $350, when it balanced the severity of the sanction and the equities of the parties. Accordingly, we conclude that the court did not abuse its discretion in awarding terms under SDCL 15–6–37(a)(4).

### 3. Request for Terms for Governor's Refusal to Answer

[¶ 24.] In his defense of Wagaman, attorney Abourezk took several depo-

sitions, including the deposition of Governor William Janklow. Abourezk asked Janklow: "Do you know who made the decision to withhold coverage to Tamara Wagaman by the PEPL fund?" and "Did you have any discussions with anybody about withholding coverage of the two women?" The Governor refused to answer these questions on the ground of attorney-client privilege. In a hearing on a motion to compel answers to these questions, Abourezk told the court that his purpose in deposing the Governor was to learn the content of the discussions the Governor had with Judy Payne, the PEPL fund administrator. The circuit court ruled that these conversations were privileged, but that the Governor was premature in refusing to answer because the two questions he refused were merely foundational. Abourezk never attempted to retake the Governor's deposition. In denying terms to Abourezk, the court ruled that he did not prevail on his motion to compel. But our review of the record shows that he did prevail in part.[10] The court reasoned that because the content of the conversations Abourezk sought were privileged, an effort to go beyond the foundational questions would have been futile. Nonetheless, the court ruled that the "decisions that the Governor ultimately made as a result of those discussions cannot be protected by the attorney-client privilege and would have to be disclosed by him."

[¶ 25.] SDCL 15–6–37(a) encompasses failures to make a disclosure required by §§ 15–6–26(a), 37(a)(2), and failure to answer questions asked under §§ 15–6–30 or 31, to make a designation under §§ 15–6–30(b)(6) or 31(a), to answer interrogatories under § 15–6–33, or to respond to requests for inspection under § 15–6–34, all of which may be dealt with by a motion to compel discovery. SDCL 15–6–37(a)(2). When a party only prevails in part on a motion to compel, the court has discretion whether to apportion terms. "If the motion is granted in part and denied in part, the court *may* apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner." SDCL 15–6–37(a)(4) (emphasis added). Thus, the court had the discretion to require that each side be responsible for their own expenses.

[¶ 26.] Moreover, a court may deny an award of expenses if it "finds that the making of the motion [to compel] was substantially justified or that other circumstances make an award of expenses unjust." SDCL 15–6–37(a)(4). Applying the *Guthrie* criteria set out above, the court found that Abourezk's statement claiming 43.15 hours of work on the motion to compel was unreasonable. Further, in the interest of equity (the fact that a second deposition was not taken) the court found that no award of expenses was necessary. Finally, the court declared that there was no showing of bad faith on the part of the Governor in refusing to answer questions. Wagaman has failed to show that the court abused its discretion in declining to award terms under § 15–6–37(a)(4).

10. The court ruled that conversations among the Governor, the PEPL fund administrator, and the fund's attorney concerning the rendition of legal services to the PEPL fund were protected from disclosure under the attorney-client privilege. SDCL 19–13–3. However, with respect to the two questions that were the subject of the motion to compel, the court's order stated: "The specific questions propounded to Governor William Janklow at page 44, lines 10 and 13, page 45, line 16 and page 46, line 9 of the deposition taken on May 10, 2000, did not deal with the content of communications between himself and Brent Wilbur [PEPL fund attorney] and are therefore not protected from disclosure by SDCL 19–13–3."

[¶ 27.] We affirm the circuit court on all issues.

[¶ 28.] GILBERTSON, Chief Justice, and AMUNDSON, Retired Justice, and TRIMBLE, Circuit Judge, concur.

[¶ 29.] SABERS, Justice, concurs in part and dissents in part.

[¶ 30.] TRIMBLE, Circuit Judge, sitting for ZINTER, Justice, disqualified.

[¶ 31.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 32.] I concur on Issues 2 and 3 but dissent on Issue 1 because:

1. Wagaman's superiors used the judicial system to bully Wagaman at her expense while protecting themselves at the State's expense.

2. Insurance principles *apply* even if PEPL is not insurance nor an insurance company.

3. The declaratory judgment action was "generated by" and "related to" the claim and the defense of the claim and is covered under PEPL.

4. Genuine issues of material fact exist as to whether the conduct of PEPL was vexatious and unreasonable.

[¶ 33.] **1. Wagaman's superiors used the judicial system to bully Wagaman at her expense while protecting themselves at the State's expense.**

[¶ 34.] The primary purpose of the youth training facility was to break these youngsters emotionally and physically and reform them into respectful, law-abiding citizens. Part of that program included these walk-runs and the "encouragement" provided by the immediate counselors. Wagaman was doing her job as it was designed and defined by her superiors. She had no control over this policy and was expected to enforce it. Failure to do that job may have resulted in her dismissal. When the policy led to the death of Gina Score, Wagaman's superiors, who designed the policy, were fully protected by PEPL. Wagaman, the person with the least control over that policy, was left standing alone without protection by her superiors or the fund specifically provided to defend her against this type of action.

[¶ 35.] Being hung out to dry was bad enough, but then Wagaman was forced to deal at her own expense not only with the civil suit in federal court, but also with the criminal case. This declaratory judgment action was the last straw. She had no choice but to defend the declaratory judgment action at her own expense or forfeit her coverage under PEPL. Wagaman's superiors used her as a scapegoat and used the judicial process to bully her civilly and criminally while they were protected under PEPL. This is a wrong that is not tolerated by the law and should not be tolerated by this Court.

[¶ 36.] **2. Insurance principles *apply* even if PEPL is not insurance nor an insurance company.**

[¶ 37.] Although SDCL 3–22–18 provides that PEPL is not insurance and is not considered an insurance company, we have recognized that principles of insurance law still apply. *PEPL v. Winger,* 1997 SD 77, ¶ 8, 566 N.W.2d 125, 128 n5; *Kyllo v. Panzer,* 535 N.W.2d 896, 900 (S.D. 1995); *See also,* ¶ 7, majority opinion (referring to principles of insurance to support a proposition regarding PEPL). We should continue to follow this course and apply principles of insurance law to the PEPL fund, including vexatious or unreasonable refusals to pay.

[¶ 38.] Failure to apply insurance principles would be a travesty of justice.

[¶ 39.] First, by refusing to apply either contract or insurance principles to PEPL, the majority opinion leaves PEPL free of any legal repercussions for acting in bad faith against those it covers.

[¶ 40.] Second, the majority opinion eliminates any judicial oversight of this fund. If principles of insurance do not apply, how can the judicial system enforce such provisions as SDCL 3–22–8? (providing in part, "the PEPL *shall* pay any valid claim up to the limits established in § 3–22–1[.]") (emphasis supplied).

[¶ 41.] Third, the majority opinion precludes any recourse for a state employee who is wrongfully denied coverage under the plan, simply because SDCL chapter 3–22 provides no specific or express recourse.

[¶ 42.] The majority opinion refuses to hold PEPL accountable for its actions by stating that to do so "would adversely affect the pool's ability to provide members cost-effective liability coverage and subsequently defeat the purpose and intent of these self-insuring groups." That reasoning is flawed because while *one* purpose of such a pool is that the coverage be "cost-effective," the *primary* purpose is to provide liability coverage to State employees. With no judicial or statutory mechanism to ensure that PEPL will provide liability coverage to state employees, coverage would be at the whim of the directors of the fund even though the employee is legally entitled.

[¶ 43.] **3. The declaratory judgment action was "generated by" and "related to" the claim and the defense of the claim and is covered under PEPL.**

[¶ 44.] The majority opinion unreasonably constricts the language of the Memorandum. The plain language of that document indicates that attorney's fees for defending a declaratory judgment action are payable. These fees are "generated by" and "related to" adjustment, defense and litigation of the claim. As noted in the majority opinion, properly payable "defense costs" are defined as, "fees and expenses *generated by* and *related to* adjustment, investigation, defense or litigation of a claim." (emphasis supplied).

[¶ 45.] A different conclusion may have been reached in similar circumstances if PEPL had not brought the declaratory judgment action against Wagaman. When PEPL did so, Wagaman had to defend or forfeit her PEPL coverage. PEPL forced Wagaman to incur these related defense costs by commencing the declaratory judgment action against her. A declaratory judgment action brought to determine whether a claim must be defended is inherently "generated by" and "related to" the claim and the defense of that claim. The sole question in this declaratory judgment action was whether PEPL was obligated to defend a claim. Thus, the action was generated by and directly related to the claim and the defense of that claim and was covered under "defense costs."

[¶ 46.] **4. Genuine issues of material fact exist as to whether the conduct of PEPL was vexatious and unreasonable.**

[¶ 47.] Whether PEPL's refusal to pay is vexatious or without reasonable cause under SDCL 58–12–3 is a question of fact. *Sawyer v. Farm Bureau Mut. Ins. Co.*, 2000 SD 144, ¶ 29, 619 N.W.2d 644, 652; *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 763 (S.D.1994). This record reveals genuine issues of material fact regarding whether PEPL's conduct was vexatious and unreasonable.

[¶ 48.] First, PEPL's own investigator determined that Wagaman should be afforded coverage "for any liability that may arise out of this situation."

[¶ 49.] Second, Wagaman was performing her job according to State policy.

[¶ 50.] Third, PEPL defended all of Wagaman's superiors and the nurse for actions equally if not more culpable than hers.

[¶ 51.] Fourth, PEPL did not consult the Attorney General before denying coverage.

[¶ 52.] Whether any one of these acts rose to the level of vexatious or unreasonable refusal to pay is a question of material fact rendering the trial court's grant of summary judgment premature and improper. *See, Department of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989) (providing, in a summary judgment action, the evidence must be viewed in a light most favorable to the nonmoving party, the burden of proof is on the movant, and reasonable doubts as to the existence of a genuine issue of material fact should be resolved against the movant); *Wilson v. Great Northern Railway Co.,* 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968).

[¶ 53.] We should reverse and remand to the trial court to determine these genuine issues of material fact.